# COURT OF APPEALS OF TEXAS.

## GALVESTON TERM, 1882.

---

### HENRY HOMBERG *v.* THE STATE.

1. MURDER — MANSLAUGHTER — CHARGE OF THE COURT. — If in a trial for murder there be evidence which tends to prove that the killing was justifiable homicide in self-defense, but none which tends to prove that the homicide was committed under the immediate influence of sudden passion arising from an adequate cause, then there is no necessity for instructions to the jury upon the law of manslaughter. Note the facts of this case in illustration.
2. FACT CASE. — See evidence held sufficient to sustain a conviction for murder in the second degree.

APPEAL from the Criminal District Court of Galveston. Tried below before the Hon. GUSTAVE COOK.

The indictment in this case was presented July 14, 1881, and charged that Henry Homberg, the appellant, did, on May 26, 1881, with a certain pistol, and of his malice aforethought, unlawfully, wilfully and feloniously kill and murder Barbara Homberg, in the county of Galveston, by shooting her in the stomach. The cause was tried in the ensuing November, and appellant was convicted of murder in the second degree. A term of forty years in the penitentiary was the punishment assessed by the jury. The appellant and deceased were husband and wife.

L. O'Conner, for the State, testified that, on May 26, 1881, he was at work on a car in the yard of the Galveston, Houston and Henderson Railroad, when he heard a shot, and, immediately turning around, saw the smoke

of a pistol between the defendant and Barbara Homberg. She threw up her hands, staggered and ran; and then the witness saw defendant shoot at her, and then run off, pistol in hand. When the witness first saw the man and woman they were about three feet apart, and when the shooting took place the witness was about fifteen yards from them. Witness saw nothing in the woman's hands but a parasol or fan. If she had a pistol, the witness thought he would have seen it. After the first shot she threw up her hands, ran about fifteen feet, and fell. The shooting took place about two blocks from the street railway in Galveston.

John Smith, for the State, testified that as the defendant and the deceased were coming towards him his attention was called to them by their loud talking. Deceased told the defendant to go away and let her alone; she said she would scream. Defendant drew his pistol and shot her; she threw up her hands, shook all over, cried "murder," ran staggering, and fell just after the second shot. Defendant shot at her as she ran from him, and then he ran off with the pistol in his hand. Witness saw the defendant and the deceased for some distance before the shooting occurred, and, as they were talking loud, he did not take his eyes off them until the shooting took place. They were walking, side by side, towards witness. Deceased had a parasol in her hand; she had no pistol. If she had have had a pistol, witness thought he would have seen it. Deceased stopped first, and turned her face side-like to defendant. She was facing witness, and defendant facing from witness. The witness went for the police; he did not go to the deceased.

H. Bergstrom, for the State, testified that he saw the shooting and the incidents immediately preceding it, and his account of them was the same in substance as that given by John Smith. He heard the deceased tell defendant to go away and let her alone. They were walk-

ing together, and were talking excitedly. She stopped and defendant shot her; she threw up her hands, cried "murder," and ran staggering. As she ran from the defendant he shot at her again. She fell in some one's arms, who moved her to a dry spot and laid her down. She had a parasol in her hand, and no pistol; witness would have seen a pistol if she had had one in her hands. He was about twelve yards from her and the defendant when the shooting occurred.

The State introduced and examined five other witnesses. Their testimony was corroborative of the material circumstances related by those who preceded them, but disclosed little else of any importance. One of them took the deceased to the hospital in a wagon, and thought she died before she got there. She was shot in the stomach. E. E. Massein, an officer, pursued the defendant, and found him in the loft of a stable. Defendant was arrested without trouble, and claimed the officer's protection. The State rested at this stage of its evidence.

The first witness introduced by the defense was William Homberg, a brother of the accused. He testified that he had known the deceased for fifteen years. She had been defendant's wife between seven and nine years, and they had four children. She was a bad woman and went with other men. About seven months before her death, while attending a justice's court held by H. Weyer, a magistrate of Galveston county, she threatened to kill the defendant, and attempted to do so with a gun, but was prevented by persons who wrested the gun from her. She afterwards threatened to kill him, and employed two men to watch for and kill him. She had always treated the defendant badly, was stout and muscular, and larger than her husband. Witness had heard her make many threats against defendant. She was known to be a bad woman, and consorted with other men. Defendant and deceased were married in the house of witness's father.

On cross-examination the witness stated that the defendant knew the deceased to be a bad woman before he married her. She kept a bad house before they married. Witness only knew from hearsay that deceased consorted with other men. She lived with defendant after she threatened him, and was living with him up to three days before her death.

Arthur O'Maro was examined as a witness for the defense, but testified that deceased was a good and virtuous woman, and worked hard to support her children. Defendant did not support her, and she had come to witness for money to buy bread for her children. The witness stated that the deceased married at his house, when she was about thirteen years old; but whether to defendant or a previous spouse does not appear. She lived at witness's house a long time, and nursed his children.

C. Muller, for the defense, testified that he had known the deceased ever since she was a little girl. Every one knew she was a bad woman; her character was notorious. A short time before her death she lived on an alley, and witness saw her there in bed with a negro man. "She was a bad woman,— was on the town." On cross-examination the witness stated that he rode up to the window of deceased's house, and, looking over the window curtain, saw her in bed with the negro.

Mrs. Helmers, for the defense, testified that the deceased, only three or four hours before she was killed, told her that she, the deceased, had now got a good man who had plenty of money, and that she had left her husband five days previous. She named Henry Knolte as the good man she had got, and said he was watching for the defendant, to kill him. Deceased said she had left her husband and would live with Knolte. She also said that she loved Antone Maltzberger, and she would work and give him whatever money she made. She said she had been living with a black man, and was fearful she would

have a black child by him. This occurred at witness's house, a few hours before the deceased was killed. On cross-examination the witness stated that she remonstrated with deceased, and advised her to go back to her husband.

Henry Weyer, for the defense, testified that the deceased had threatened her husband, the defendant, and had attempted to kill him. When provoked she was a violent and bad woman. Witness had seen her in a wagon with Maltzberger, going down the island. She once left her husband and small children, and went off to Houston. Defendant went after her and brought her back. About seven months before her death, she threatened and attempted to shoot the defendant at the courtroom of witness, who was a justice of the peace.

J. D. Braman, also a justice of the peace, testified for the defense that Knolte and the deceased, two days before the latter was killed, were arrested on complaint of the defendant for threats against and an assault on him. In the presence of the court the deceased, on that occasion, said she would kill the defendant,— she would have his heart's blood. The next day the matter was compromised. Defendant then showed a wound on his face which he said she had inflicted with her fist. She made affidavit of assault against him, as well as he against her. Witness and the district attorney thought there was more feeling in the cases than anything else, and agreed to dismiss them. Witness paid no attention to the threats; did not think they amounted to anything.

A. P. McCauley, for the defense, testified that, about a week before the death of Mrs. Homberg, she made threats against the life of her husband, the appellant. She said she would "fix him yet."

George Eggert, for the defense, stated that he accompanied the defendant to the latter's home, the day before the killing, for the purpose of moving some furniture.

The deceased was very violent about it, and witness and defendant went off.   Witness thought the deceased had a pistol in her hand.

Ed. Eggert, a son of the last witness, testifying for the defense, stated that he was present on the occasion mentioned by his father, and witnessed all that transpired.   The deceased, addressing her husband, the defendant, said "I am going to kill you," and pointed at him what the witness took to be a pistol.   Fearing something bad would happen, the witness and his father left, and took the defendant along with them.   Witness saw the pistol in the hands of Mrs. Homberg.   She followed them some distance.   She came from John Homberg's place when she first appeared, and afterwards she went back there.   Henry Knolte lived at John Homberg's.

W. H. Parker, for the defense, testified that he was driving a street car the day of the killing.   Deceased got on the car near the opera house on Market street.   The car was going west, towards the freight depot of the Galveston, Houston & Henderson railroad.   Deceased was excited and hurried the witness up.   Replying to his inquiry as to the cause of her hurry, she said she had heard that her husband was at the depot, and she was going to kill him.   Witness asked her what with, and she put her hand on her dress-pocket and said "I have it right here."   She got off at the end of the track, and on the witness' return trip he heard that she had been killed.

John Hanna, for the defense, stated that he was standing at the round-house of the Galveston, Houston & Henderson railroad, and saw the deceased get off the street car and run up to the defendant and tap him on the shoulder.   After going about three steps, she got in front of the defendant, and drew a pistol and shot at him.   He knocked the pistol off with his left arm, and they walked on some ten or twelve steps, when she again pointed the

pistol at him, and then he drew his pistol and shot her. She ran and he shot at her again. Witness saw her pistol when it fell from her hands, and saw where it fell, and, after the crowd dispersed, he went and kicked about in the sand until he kicked the pistol up. One of the shells had been discharged. A small, bright, new-looking pistol being exhibited, the witness identified it as the one picked up by him.

On cross-examination the witness stated that he said nothing to any one about his seeing the shooting, and did not appear as a witness at the coroner's inquest. On the 27th of May he left for Indianola on the steamship Norfolk, which left at four o'clock. He hid the pistol under the house of Mrs. Emma Whitney, where he then lived, and, after staying two months at Indianola, came back and got it. He gave it to defendant's attorney. Here the defense closed its proof.

In rebuttal the State recalled L. O'Conner, who testified that the distance from the round-house to the place of the shooting was from seventy-five to a hundred yards. A person standing at the round-house could not see the turn-table of the street cars, nor see any one getting out of a car. Neither could a person at the round-house have seen the shooting, because there were box-cars on the track between the round-house and where the shooting occurred, and they would have obstructed the view. Only two shots were fired; if there had been others the witness would have heard them. The deceased had no pistol and used none; nor, so far as witness could see, did she make any attempt to shoot. The State corroborated this testimony by another witness.

Rexel, a gunsmith, was introduced by the State, and, being shown the pistol identified by John Hanna, said it could not have been under a house for two months; if it had been, the plating would be rusty. It had been discharged, but not so long ago as May, 1881. Another expert testified to the same effect.

Emma Whitney testified that John Hanna was not living at her house when Mrs. Homberg was killed. He had left about two weeks before that occurrence.

Two witnesses testified that they knew the defendant's witness C. Muller, and his general reputation for truth. It was bad, and they would not believe him on oath.

The defense recalled Henry Weyer. He knew Muller and his general reputation for truth. Witness thought it was good, and would believe him on oath.

*W. B. Denson, L. F. Price,* and *A. Butell,* for the appellant.

*H. Chilton,* Assistant Attorney General, for the State.

Hurt, J.     Henry Homberg was convicted of the murder of his wife, Barbara Homberg, the jury finding him guilty of murder in the second degree, and assessing his punishment at confinement in the penitentiary for the term of forty years. It is admitted that there is but one question presented for our decision, which is, "does the evidence or any part thereof present an issue upon manslaughter? If so, the court, having failed to charge thereon, committed error, and consequently the judgment should be reversed."

To a fair and honest determination of the question as to whether there is any evidence tending to present the issue of manslaughter, each and every fact or circumstance tending to present the issue should be segregated from the rest of the facts, and viewed in the same light as if there had been no other evidence in the case. Proceeding upon this theory, let us suppose that the only evidence in the case is that upon which appellant relies as a foundation for a charge upon manslaughter. Taking this, and this alone, was the question of manslaughter presented?

At this point a statement becomes necessary. We will take that of appellant's counsel.

"Two days before the killing, the deceased and one Henry Knolte were in J. D. Braman's court, under arrest upon complaint of defendant, charged with an assault and battery upon him. The deceased then, in the presence of the court, declared that she would kill defendant — that she would have his heart's blood.

"A few hours before the killing, deceased told the witness Mrs. Helmers that she had left her husband and got another man — the man Henry Knolte, who had plenty of money; that he (Knolte) was looking for her husband to kill him; stated that she had left her husband and would live with Knolte; that she also loved one Maltzberger and would give him all the money she could get; that she had been living with a negro man and feared that she would have a child by him. The day before the killing, George Eggert and his son Ed. went with defendant to his home to haul some furniture for him. The deceased came there and acted so violently that they left, fearing that something serious would happen. The deceased, addressing defendant, said that she would kill him, and pointed a pistol at him; they (witnesses) left, fearing that something bad would happen, and took defendant with them; deceased followed them to near Broadway. Deceased came out of John Homberg's house when she came to witness's. Henry Knolte lived at John Homberg's.

"The witness John Hanna, at and before the killing, was standing at the round-house of the G., H. & H. R. Railway; saw the deceased get out of the street car and run up to defendant, and tap him on the shoulder. After going a few steps she got in front of defendant, and drew a pistol and shot at him. After they had gone some ten or twelve steps she again got in front of him and presented a pistol at him, when he drew his pistol and shot her. She ran and he shot at her again. Saw the pistol drop from her hand, and saw where it fell. Afterwards

went to the place and picked it up.  Produced it upon the trial."

If these facts were true, a very clear case of self-defense was made out, upon which the court gave the defendant a concise, affirmative and liberal charge.  The jury could not have believed this last witness and have convicted defendant of any offense.

Again: under the charge of the court below, if this witness's testimony had produced a reasonable doubt in the minds of the jury as to the truth of his testimony, complete justification would have followed.  This evidence presents no middle ground between murder and self-defense.  If believed, not guilty; if not, guilty of murder, and nothing less than murder.

But again, suppose that this statement contained all of the evidence against defendant, and he has been convicted of manslaughter.  Could such a conviction be sustained by this evidence ?  It may be answered by counsel for appellant that the conviction could not, for the reason that to convict of any offense the evidence must establish the guilt beyond a reasonable doubt, while on the other hand, if there be any evidence tending to present an issue on an offense of less degree, it is the duty of the court to charge on such offense.

But suppose the court had charged on manslaughter and defendant had been convicted of that offense, this statement being all of the evidence in the case; would not there have been very serious, yea well-founded complaint of such a charge ?  We think so.  Why ?  Because there is no fact tending to present any other issue than self-defense which could have been believed by the jury without resulting in a full and complete justification.

Hence we conclude that if there had been submitted to the jury a charge upon manslaughter, it would not have been of the least benefit to the defendant; because, 1, there was no evidence to support it; and 2, if there had

been, the jury would not have believed the witness. If so, an acquittal would have followed.

The court did not err in failing to charge upon manslaughter. The judgment is affirmed.

*Affirmed.*